# EXHIBIT A

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

MICHIGAN DEPARTMENT OF
ENVIRONMENT, GREAT LAKES, AND
ENERGY; and MICHIGAN DEPARTMENT
OF NATURAL RESOURCES,

No. 22-                    -CE

    Plaintiffs,

HON.   CLINTON CANADY III

v

STS HYDROPOWER, LLC; and EAGLE
CREEK RENEWABLE ENERGY, LLC,

    Defendants.

_____

Megen E. Miller (P78901)
Kelly M. Drake (P59071)
Assistant Attorneys General
Attorney for Plaintiffs
Michigan Department of Attorney General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
mmiller59@michigan.gov
drakek2@michigan.gov
_____/

There is no other pending or resolved civil action arising out of
the transaction or occurrence alleged in the complaint.  MDR
2.113(A); MCR 1.109(D)(2)(a)(i).

**COMPLAINT**

The above-named Plaintiffs, by their attorneys Megen E. Miller and Kelly M.

Drake, Assistant Attorneys General, state as follows:

1

## INTRODUCTION

1.      This lawsuit is about the Defendants' gross mismanagement of a drawdown of Morrow Lake to complete repairs to Defendants' dam on the Kalamazoo River.  The State of Michigan supports all dam owners appropriately maintaining and completing repairs to their dams.  But in doing so, a dam owner is legally obligated to complete such repairs in a manner that does not unnecessarily impact the public health, safety, and welfare; the natural resources of the State; and the environment.  Despite repeated demands by the Federal Energy Regulatory Commission (FERC) and the State of Michigan for measures to minimize the drawdown's environmental impact, Defendants' mismanaged drawdown resulted in hundreds of thousands of cubic yards of sediment mobilizing down a stretch of approximately 30 miles of the Kalamazoo River, creating a public safety hazard; choking the river and smothering fish, wildlife, and aquatic organisms; and impeding recreational use.  This lawsuit seeks to hold Defendants accountable for the injuries they have caused the public and natural resources and to vindicate the public's right to safely access and use the waters of the State.  This suit seeks civil fines against Defendants for their gross mismanagement of the drawdown of Morrow Lake and the harm that it has caused to the public, as well as monetary relief for the damage caused to the public's natural resources, and equitable and prospective relief to restore the harm that was done and to ensure that it does not happen again.

2

## PARTIES, VENUE, AND JURISDICTION

2.      The Michigan Department of Environment, Great Lakes, and Energy
(EGLE) is the agency tasked with enforcing Michigan's environmental laws,
including Part 31, Part 301, and Part 303 of the Natural Resources and
Environmental Protection Act (NREPA), MCL 324.3101 *et seq.*, MCL 324.30101 *et
seq.,* and MCL 324. 30301 *et seq.*

3.      The Michigan Department of Natural Resources (DNR) is the agency
that manages the fish and wildlife in Michigan, which by law belong to the public.
MCL 324.40105; MCL 324.48702(1).

4.      STS Hydropower, LLC, (STS Hydropower) is a Michigan limited
liability company with a registered office located at 2900 West Road, Suite 500,
East Lansing, Michigan 48823.  STS Hydropower was originally STS Hydropower,
Ltd., a Michigan corporation, but in October 2017, it converted to a limited liability
company.  STS Hydropower owns Morrow Dam, the property where the dam is
located, and the property around Morrow Lake.  STS Hydropower's ultimate parent
company is Ontario Power Generation Inc., which is owned by the Government of
Ontario, Canada.

5.      Jurisdiction over STS Hydropower is appropriate in this Court
pursuant to MCL 600.711(1) and (3) because STS Hydropower was formed under
the laws of Michigan and operates multiple hydroelectric dams throughout
Michigan, and MCL 600.715(1) and (3) because STS Hydropower owns and operates
Morrow Dam and the surrounding land in Michigan, which forms the basis of the
transactions and occurrences that give rise to this Complaint.

3

6.      Eagle Creek Renewable Energy, LLC, (Eagle Creek) is a Delaware limited liability company with a registered agent located at 251 Little Falls Drive, Wilmington, Delaware 19808.  Eagle Creek is not registered to do business in Michigan.  Eagle Creek is in the organizational ownership structure between STS Power and Ontario Power Generation, Inc.  Like STS Hydropower, Eagle Creek's ultimate parent company is Ontario Power Generation Inc.  Eagle Creek engaged with STS Hydropower to operate the dam and for the drawdown of Morrow Lake for dam repairs.

7.      Jurisdiction over Eagle Creek is appropriate in this Court pursuant to MCL 600.715(1) because Eagle Creek engages with STS Hydropower in the operation of STS Hydropower's dam in Michigan, which forms the basis of the transactions and occurrences that give rise to this Complaint.

8.      Venue is appropriate in this Court, and this Court has jurisdiction, because this action is "brought by the attorney general in the name of the state or of the people of the state, for the use and benefit thereof," so it is "as though the cause of action arose in" Ingham County.  MCL 14.102; see also MCL 600.1631. Additionally, the violation of a statute passed to benefit the public welfare is a public nuisance, and circuit courts have jurisdiction over actions to abate public nuisances.  MCL 600.2940(1).  Venue is also appropriate in this Court because under Part 303 and Part 31, a civil action may be brought in Ingham County Circuit Court for actions under those Parts of the NREPA, MCL 324.30316(1); MCL 324.3115(1), and under the Revised Judicature Act, "venue is proper in any county

in which either cause of action, if sued separately, could have been commenced and tried." MCL 600.1641(1).

## GENERAL ALLEGATIONS

9.     This environmental disaster is the product of gross mismanagement and blatant disregard of public safety and destruction of natural resources on the part of the Defendants.  As set forth below, Defendants' refusal to employ reliable forms of management for the drawdown to properly mitigate damage to the river has created significant, avoidable harms— risks to public safety, damage to the natural resources, and deprivation of the public's right to access and use the waters of the State—all while Defendants were profiting from the use of the public's waterways.  The risk to public safety and these damages to the natural resources are ongoing, and the impact to natural resources multiplies each day the impacts remain unabated.

10.     Michigan's Constitution declares the "conservation and development of the natural resources of the state" to be "of paramount public concern in the interest of the health, safety and general welfare of the people."  1963 Const, art 4, § 52. Accordingly, it orders the Legislature to "provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction." *Id.*

11.     Because these resources belong to the public, when persons use the resources to earn money, they owe a duty to the public to treat the resource responsibly and in a manner that preserves the public's rights.  Here, Defendants

earned money from exploiting the power of the public's waterways, so they had a duty to protect the public safety and to not destroy the public's natural resources.

12.     To carry out its constitutional mandate, the Legislature created the Natural Resources and Environmental Protection Act, MCL 324.101 *et seq.* Defendants' actions implicate several provisions of that Act, including at the very least Part 17 (Environmental Protection Act), Part 31 (Water Resources Protection), Part 301 (Inland Lakes and Streams), Part 303 (Wetlands Protection), Part 401 (Wildlife Conservation), and Part 487 (Sport Fishing).

13.     Morrow Dam sits between two environmental cleanup sites.  The Allied Paper/Portage Creek/Kalamazoo River Superfund Site, which largely focuses on polychlorinated biphenyl (PCB) contamination, starts at Morrow Dam and then continues downstream to Lake Michigan.  The Enbridge Line 6B oil spill Oil Pollution Act site starts upriver from Morrow Dam and continues down past Morrow Lake to Morrow Dam.

**History of Morrow Dam and Defendants' Organizational Structure**

14.     In 1985, the Federal Energy Regulatory Commission (FERC) issued an order granting STS Consultants, Ltd., exemption from licensing under the Federal Power Act of a small hydroelectric project of five megawatts or less in the Kalamazoo River at Comstock Township, Sections 21-28, T2S, R10W, Kalamazoo County.  (July 26, 1985 Order Granting Exemption from Licensing of a Small Hydroelectric Project of 5 Megawatts or Less, hereafter "Exemption.")  FERC issued the Exemption pursuant to 18 CFR Part 4, Subpart K (1980) implementing in part

6

Section 405 and 408 of the Energy Security Act (ESA) of 1980, 16 USC 2705 and 2708. This hydroelectric project would come to be known as the Morrow Dam, which created the impoundment now known as Morrow Lake, and is identified as P-9000.

15.     An exemption from licensing means that the project is exempt from certain licensure requirements under the Federal Power Act. 16 USC § 823a(a)(1). An exemption from licensure does not mean that a hydroelectric project is free to disregard and violate state and federal laws.

16.     On September 15, 1987, the exemption was transferred to STS Hydropower, Ltd.

17.     On March 13, 2017, Eagle Creek Development Holdings, LLC, acquired STS Hydropower, Ltd. On information and belief, Eagle Creek Development Holdings, LLC, is a subsidiary of Eagle Creek PF II, LLC, which is a subsidiary of Defendant Eagle Creek Renewable Energy, LLC.

18.     On October 10, 2017, STS Hydropower, Ltd., converted into a limited liability company and became STS Hydropower, LLC. STS Hydropower did not inform FERC of this change until May 22, 2020.

**Drawdown of Morrow Lake**

19.     Soon after the acquisition of STS Hydropower by the Eagle Creek entities, FERC notified Defendants in November 2017 of the need to repair the tainter gates at Morrow Dam. The tainter gates are structures on the dam that can be opened or closed to control water flow. While Defendants took certain actions to

address some issues, Defendants' actions did not address all of the concerns raised by FERC.

20.     STS Hydropower promised that in 2019 it would undertake an inspection of the gates.  (October 18, 2019 FERC Letter to Eagle Creek, p 7.)

21.     FERC reported that on October 17, 2019, STS Hydropower "informed Commission staff that [STS Hydropower] had discovered damages to the trunnion arms on two tainter gates at the Morrow Dam Hydroelectric Project No. 9000." (August 5, 2020 FERC Letter to STS Hydropower.)  The trunnion arms are the supports for the tainter gate.  The trunnion arms attach the tainter gate to the dam structure via a trunnion pin and allow the tainter gate to swing up and down along a radius to open and close.

22.     Upon information and belief, Defendants decided to draw down Morrow Lake at that point even though they had not developed plans to complete repairs on the tainter gates.

23.     On October 31, 2019, for the first time, EGLE and DNR were notified by Eagle Creek staff that Defendants would be conducting a drawdown of Morrow Lake "effective immediately," claiming the drawdown was an emergency.  At that time, Defendants indicated the drawdown would only last four months.

24.     From on or about October 31, 2019, to November 22, 2019, Defendants conducted a drawdown of Morrow Lake, lowering the normal impoundment elevation approximately nine feet, exposing lake bottomlands in some areas.

8

Despite Defendants' predictions of a four-month drawdown, Morrow Lake remained at the lowered elevation for more than a year, until December of 2020.

25.     By November 1, 2019, the day after state agencies were notified of the emergency drawdown, agency staff had relayed concerns about the drawdown; recommended exploring alternatives to lowering the reservoir; provided Defendants historical information on the extent of the Enbridge oil spill impacts on Morrow Lake, bathymetric maps, and data regarding Morrow Lake after sediment had been remediated after the oil spill; provided specific recommendations to prevent off-site mobilization of sediments from Morrow Lake; and relayed appropriate procedures for mussel and stranded organism survey and relocation.

26.     Defendants reduced the rate at which it drew down the lake in response to the State's concerns but did little else to prevent the disastrous impact of their mismanaged drawdown.

27.     In a November 1, 2019 email, Defendants indicated their intention to submit an after-the-fact permit application under state law to EGLE and that they were considering alternatives to a full drawdown.  However, Defendants have never followed through on this legal requirement.

28.     On November 27, 2019, EGLE sent a letter to Defendants notifying them that the drawdown required a permit under Part 301 of the NREPA, notifying them of concerns related to PCB contamination in the river, and requesting information about the drawdown and plans for minimizing environmental impacts and mitigating sediment mobilization.

29. Defendants undertook minimal efforts to address environmental impacts and sediment mobilization, which did little to prevent impacts to Morrow Lake and the Kalamazoo River.

**Impacts of Drawdown and End of Drawdown**

30. The drawdown and continued exposure of destabilized lake bottomlands resulted in a significant discharge of sediment downstream of the dam onto Kalamazoo River bottomlands and wetlands, within the Kalamazoo River floodplain, and within the Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site.

31. In regard to the sediment mobilization and turbidity in the water, Defendants initially only conducted visual monitoring of turbidity rather than taking any of the actions proposed by the State to minimize impacts of the drawdown. It took nearly nine months for Defendants to take any direct actions to address sediment mobilization, other than decreasing the drawdown rate, despite the existence of known reliable tools to minimize impact.

32. Defendants completed mussel relocation efforts from November 9, 2019 to November 25, 2019, but this was only after the lake was already partially drawn down and outside the recommended season for doing so, reducing the likelihood of the success of such efforts.

33. The drawdown caused sediment deposits in the River that span up to multiple acres and are up to approximately twelve feet deep in some locations, creating public safety hazards. There have been reports of deer being trapped in

10

the deposits, and a man had to be rescued by emergency responders and taken to the hospital after becoming stuck in the sediment. For reference, it is estimated that enough sediment was released from the impoundment to cover a football field approximately 173 feet deep in sediment, which is about 16 stories tall.

34. The discharged sediment also increased turbidity downstream of the dam; altered stream geomorphology and flood storage capacity; smothered critical habitat for freshwater mussels, fish, turtles, amphibians, and other aquatic organisms; and restricted public boat access to the river. The drawdown caused impacts within Morrow Lake itself by draining surface water from wetlands, exposing hibernating reptiles and amphibians to potentially fatal freezing temperatures.

35. On June 29, 2020, nearly eight months after the start of the drawdown, Defendants finally submitted plans to FERC for repairs of the gates.

36. On July 8, 2020, EGLE issued Violation Notice number VN-011076 to Defendants notifying them of violations of Part 301, Part 31, and Part 303 and requiring corrective measures.

37. On July 17, 2020, Defendants submitted a response to EGLE's Violation Notice which, among other things, included limited measures Defendants planned to implement for controlling and monitoring offsite mobilization of sediment and turbidity.

38. In July through August of 2020, over eight months after the start of the drawdown, Defendants installed turbidity curtains. Turbidity curtains are

effective tools at lowering turbidity but are not suited for preventing mass movement of sediments. Other measures, including but not limited to grade control, sediment traps, dredging, and stabilization of banks are necessary to prevent large amounts of sediment from the lake and streambed from mobilizing downstream. To have been effective, such measures should have been installed prior to the reservoir drawdown, or at worst, when it first became apparent that sediment discharges were occurring. However, throughout the summer and fall of 2020, when onsite weather conditions were ideal for completing additional mitigation and sediment removal projects on the river, no appreciable amount of work was completed by the Defendants.

39. On August 5, 2020, FERC directed Defendants to, among other things, coordinate with the State of Michigan; mitigate water quality and sedimentation issues; and obtain all necessary permits under local, state, and federal law for Defendants' activities.

40. On September 16, 2020, EGLE issued Second Violation Notice number SVN-00974 to Defendants, notifying Defendants that additional actions were necessary to address ongoing violations of Part 31, Part 301, and Part 303, and reduce transport of sediment downstream. The Second Violation Notice also directed Defendants to comply with obligations under Part 201, Environmental Remediation, of the NREPA, MCL 324.20101 *et seq.* Part 201 is the State's hazardous substance cleanup act. The State is not seeking relief under Part 201 at this time.

12

41.     On October 23, 2020, EGLE issued Permit Number WRP025847 v1.0 to STS Hydropower under Part 301 for dredging and other identified activities to facilitate the replacement of the tainter gates on Morrow Dam.  This permit covered limited activities directly related to the tainter gate replacement; it did not address outstanding violations of Part 301 caused by the drawdown.

42.     Over one year after the drawdown of Morrow Lake, in December of 2020, the gate replacement was completed and by January 12, 2021, Morrow Lake was refilled to its normal water elevation.

**After Morrow Lake was Refilled**

43.     On February 9, 2021, Defendants submitted a Phase 1 Field Investigation Report that identified, quantified, and characterized a portion of sediment deposits within an approximately seven-mile stretch of river immediately downstream of the dam.

44.     Based on information available to the State, the State estimates that hundreds of thousands of cubic yards of sediment was released down the Kalamazoo River, starting at Morrow Dam and stretching approximately 30 miles to Lake Allegan.

45.     Defendants committed to providing a Phase 2 Field Investigation Report for the remainder of the portion of the river that was impacted that would include similar information as the Phase 1 Report, but Defendants did not complete the work necessary to provide this report and this information has not been submitted to EGLE.

13

46.     The State continued to demand that Defendants address the sediments and the mismanaged drawdown's impacts to natural resources and public access to the river.

47.     Defendants publicly committed to completing multiple sediment deposition removal projects.  However, Defendants have only completed one minor project at the time of the filing of this Complaint.  On February 26, 2021, EGLE authorized Respondents to remove approximately 3,000 cubic yards of sediment from an oxbow of the Kalamazoo River in Comstock Township.  This project amounts to less than one percent of the estimated sediment released.

**Eagle Creek's Involvement with Morrow Dam and STS Hydropower**

48.     Since the acquisition of STS Hydropower by Eagle Creek and its subsidiaries, Defendant Eagle Creek has been engaged in the control and operation of the Morrow Dam.  The FERC eLibrary Administrative Record for the project is replete with correspondence between Eagle Creek and FERC regarding the hydroelectric project.  In fact, on March 14, 2017, Defendants identified an Eagle Creek employee as the "Primary Person of Record" for the dam.  (March 14, 2017 Corrected Contact Information Sheet for Morrow Dam Hydro Project, FERC Project No, 9000.)

49.     Both STS Hydropower and Eagle Creek are directly liable for violations of state law for the mismanaged drawdown of Morrow Lake.

50.     The Regulatory Manager for Eagle Creek was the person to alert FERC and the State that "ECRE [Eagle Creek Renewable Energy] staff is taking

actions to perform a controlled draw down of the reservoir at Morrow Dam."
(October 31, 2019 Rondou Email to State.)

51.     Eagle Creek continued to make decisions and engaged with FERC and
the State regarding the drawdown and its impacts.

52.     In addition to direct liability, upon information and belief, Eagle Creek
bears liability under state law as the alter ego of STS Hydropower.

53.     Upon information and belief, STS Hydropower is a mere
instrumentality of Eagle Creek.  Eagle Creek has attempted to shield itself from
liability despite its direct involvement in the drawdown by claiming that STS
Hydropower, as the owner of the dam and official holder of the FERC Exemption, is
the only company responsible for the drawdown.

54.     Upon information and belief, Eagle Creek controlled the actions of STS
Hydropower; the companies used the same finance department, management,
accountants, and attorneys; the companies are housed at the same address; and the
contractor that ostensibly was hired by STS Hydropower identified Eagle Creek as
its client on numerous occasions.

55.     The costs for removal of sediments and damages to natural resources
due to the Defendants' drawdown are significant.  Upon information and belief, STS
Hydropower and Eagle Creek may seek to avoid full responsibility for their
liabilities by limiting the assets available to STS Hydropower for addressing these
obligations.

## COUNT I: PART 17 (ENVIRONMENTAL PROTECTION ACT)

56.    All previous allegations are incorporated here.

57.    As explained above, Defendants' failure to properly manage its drawdown of Morrow Lake caused massive damage to the State's waterways and other natural resources, including the public trust in those resources.

58.    The State seeks an order under MCL 324.1704(1) that requires Defendants to repair the damage Defendants have caused to the State's natural resources and the public trust in those resources and to cease any further destruction of the State's natural resources and the public trust in those resources.

## COUNT II: PART 31 (WATER RESOURCES PROTECTION)

59.    All previous allegations are incorporated here.

60.    As explained above, Defendants' grossly mismanaged drawdown and continued refusal to mitigate environmental impacts caused the discharge of sediments harmful to the public health and safety into the waters of the state, and the deposit of unauthorized material onto floodplains.  Those discharges and deposits were in violation of MCL 324.3108 and MCL 324.3109.

61.    When there is a violation of Part 31, the State may also recover in court "the full value of the injuries done to the natural resources of the state and the costs of surveillance and enforcement by the state resulting from the violation," as well as reasonable attorney fees and costs.  MCL 324.3115(1) and (2).

62.    The State seeks an order under MCL 324.3115 requiring Defendants to clean up the discharges they have caused, compensate the State for the full value of

natural resource damages, pay civil fines of up to $25,000 per day of violation, and pay attorney fees and costs.

## COUNT III: PART 301 (INLAND LAKES AND STREAMS)

63.     All previous allegations are incorporated here.

64.     Morrow Lake and the Kalamazoo River are each an "inland lake or stream" under MCL 324.30101(i).

65.     Defendants' drawdown "diminish[ed] an inland lake or stream" without a permit in violation of MCL 324.30102(1)(d) and filled bottomlands through the deposit of unauthorized material without a permit in violation of MCL 324.30102(a).

66.     Under MCL 324.30103(1)(n), a permit is not required under Part 301 for "[t]emporary drawdowns of impoundments at hydroelectric projects licensed by the federal energy regulatory commission (FERC) and subject to FERC's authority" only if both of the following apply:

> (i)     The FERC licensee has consulted this state during the drawdown plan development and this state's concerns have been addressed in the drawdown plan as FERC considers appropriate.
>
> (ii)     Adverse environmental impacts, including stream flow, aquatic resources, and timing, have been avoided and minimized to the extent practical. [MCL 324.30103(1)(n).]

67.     Defendants are not licensees under the Federal Power Act and are not entitled to use this exemption under Part 301. See 16 USC 796(5). Under the Federal Power Act, a "licensee" is "any person, State, or municipality licensed under

17

the provisions of section 797 of this title, and any assignee or successor in interest thereof." *Id.* Defendant STS Hydropower holds an exemption, not a license, and is therefore not a licensee.

68.     Even if Defendants can be considered a licensee under the Federal Power Act, Defendants do not meet the conditions necessary for the permit exemption in Part 301 to apply.  Defendants did not address the State's concerns as FERC directed and did not avoid and minimize adverse environmental impacts to the extent practical.  MCL 324.30103(1)(n).

69.     Defendants' malfeasance and mismanagement has decimated the ecosystems of Morrow Lake and an approximately 30-mile stretch of the Kalamazoo River and caused the deposit of large amounts of unauthorized material on bottomlands.

70.     The State seeks an order under MCL 324.30112 requiring Defendants to pay civil fines of up to $5,000 per day of violation, restore the Morrow Lake and Kalamazoo River ecosystems to their prior conditions, and clean up the unauthorized material on bottomlands.

## COUNT IV: PART 303 (WETLANDS PROTECTION)

71.     All previous allegations are incorporated here.

72.     The drawdown of Morrow Dam drained wetlands reliant on Morrow Lake without a permit in violation of MCL 324.30304(d).  The water levels of Morrow Lake have been restored, but the drainage of the wetlands altered the

habitat conditions and suitability for aquatic species that rely on these ecosystems, throughout the duration of the drawdown.

73. Upon information and belief, the deluge of sediments resulting from Defendants' mismanaged drawdown caused the unauthorized deposit of fill materials into wetlands downstream of Morrow Dam, without a permit, in violation of MCL 324.30304(a).

74. The State seeks an order under MCL 324.30316 requiring Defendants to restore the affected wetlands as nearly as possible to their condition prior to the 2019 drawdown of Morrow Lake and assessing civil fines of up to $10,000 per day of violation.

## COUNT V: CONVERSION

75. All previous allegations are incorporated here.

76. The State owns the fish, wildlife, and other aquatic species that were destroyed by Defendants' malfeasance. MCL 324.48702(1); MCL 324.40105.

77. Defendants had a duty not to interfere with the State's property, let alone destroy it.

78. Defendants knew or should have known that their actions would cause a deluge of sediments to flow downriver killing fish and wildlife and exposing large portions of the bottomland of Morrow Lake, killing aquatic life. Defendants have been told on multiple occasions about the significant impact to fish, wildlife, and aquatic resources, but have taken minimal actions to address the harm.

19

79. Defendants' actions wrongfully exerted dominion over the fish, wildlife, and aquatic life and caused their death, which denies and is inconsistent with the State's rights to them.

80. Defendants' actions constitute a taking, and it was contrary to law for Defendants to take the State's fish, wildlife, and aquatic life without authorization. MCL 324.48702(1); MCL 324.40105.

81. The State seeks damages for Defendants' conversion of the State's fish, wildlife, and aquatic life.

## COUNT VI: PUBLIC NUISANCE

82. All previous allegations are incorporated here.

83. Defendants' actions have created a public nuisance because the general public has a common right to be free from the public safety hazard posed by sediment deposits that resulted from the mismanaged drawdown of Morrow Lake, and also to enjoy and benefit from the natural resources that are part of the Morrow Lake and Kalamazoo River ecosystems.

84. Defendants' actions have unreasonably interfered with those common rights because they have significantly destroyed portions of the ecosystems of Morrow Lake and the Kalamazoo River; transformed large portions of the Kalamazoo River into a public safety hazard; and covered a Superfund Site contaminated with PCBs, and dioxins and furans, with significant deposits of sediment.

20

85. Defendants' actions have also unreasonably interfered with that common right because those actions are proscribed by law. As alleged above, Defendants' actions have violated Parts 17, 31, 301, 401, and 487 of the NREPA. Each of those parts are laws passed to preserve the public welfare. A violation of Part 31 is prima facie evidence of a public nuisance:

> A violation of this section is prima facie evidence of the existence of a public nuisance and in addition to the remedies provided for in this part may be abated according to law in an action brought by the attorney general in a court of competent jurisdiction. [MCL 324.3109(6).]

86. Not only have Defendants created the public nuisance by their actions, but the nuisance emanates from land they own or control.

87. The State seeks an order requiring the abatement of the public nuisance by repairing and restoring the damage caused by the mismanaged drawdown of Morrow Lake and forbidding Defendants from further harming public rights.

## RELIEF REQUESTED

For these reasons, the State seeks the following:

a. A declaration that Defendants STS Hydropower, LLC, and Eagle Creek Renewable Energy, LLC, violated Parts 17, 31, 301, 303, 401, and 487 of the NREPA, as well as the common law doctrines of conversion, and public nuisance;

b. A declaration that Eagle Creek is the alter ego of STS Hydropower;

c. Civil fines;

d. Recovery of the full value of natural resource damages;

21

e.    A declaration that Defendants' violations of the common law and NREPA have created an ongoing public nuisance and an order requiring the abatement of the public nuisance;

f.    An order requiring Defendants to restore and repair the damage they caused;

g.    The relief authorized by MCL 324.1704, MCL 324.3115, MCL 324.30112, and MCL 324.30316;

h.    An order reimbursing the State's enforcement expenses, including oversight costs, litigation expenses, and attorney fees;

i.    Any other relief the Court considers appropriate.

Respectfully submitted,

*/s/Megen E. Miller*
Megen E. Miller (P78901)
Kelly M. Drake (P59071)
Assistant Attorneys General
Attorneys for Plaintiff
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
millerm59@michigan.gov
drakek2@michigan.gov

Dated: March 1, 2022

LF: STS Hydropower, LLC (EGLE/DNR v) CC/AG# 2020-0308060-B/Complaint 2022-03-01